W. X. HUBER Co. *v*. UNITED STATES (No. 4465).[1]

United States Court of Customs and Patent Appeals, July 3, 1945

*Philip Stein* for appellant.

*Paul P. Rao*, Assistant Attorney General (*Sybil Phillips* and *Joseph F. Donohue*, special attorneys, of counsel), for the United States.

[Oral argument February 8, 1945, by Mr. Donohue; submitted on brief by appellant]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges

GARRETT, Presiding Judge, delivered the opinion of the court:

A decision adverse to appellant was rendered by us in this case (which is an appeal from a judgment rendered September 8, 1943, by the Second Division of the United States Customs Court) on March 5, 1945.

Copies of the opinion embodying the reasons for our decision were forwarded to counsel for the respective parties but, in conformity with our practice, publication of the opinion was withheld to await receipt of any application for rehearing or reconsideration which might be filed within the time permitted by our rules. Appellant within the time permitted (after an extension of time granted) filed a petition for rehearing and a brief in support of same.

[1] C. A. D. 315.

The petition has been studied in the light of the brief accompanying it and in the light of the Government's reply thereto, with the result that we have decided to revise our original opinion and elaborate upon certain points. Our conclusion is unchanged and the petition for rehearing is granted only for the purpose indicated.

The merchandise, samples of which were admitted in evidence when offered by counsel for appellant, consists of embroidered articles made from cloth produced by weaving what we may, at this point, designate as "strands" obtained from a species of "grass" which grows in China from which country the merchandise was exported to the United States in 1937. The samples in evidence, marked as Collective Exhibit 1, consist of a table cover and four smaller pieces evidently designed to be used as napkins.

Entry was made at the port of Los Angeles, California, where the Collector of Customs classified the merchandise under paragraph 1529 of the Tariff Act of 1930, apparently as embroidered articles composed wholly or in chief value of yarns, threads, or filaments, duty being assessed and collected at the rate of 90 per centum ad valorem.

The pertinent portion of paragraph 1529 reads:

PAR. 1529. (a) * * *; and fabrics and articles embroidered * * *; all the foregoing, and fabrics and articles wholly or in part thereof, finished or unfinished * * * by whatever name known, and to whatever use applied, and whether or not named, described, or provided for elsewhere in this Act, when composed wholly or in chief value of filaments, yarns, threads, * * * 90 per centum ad valorem.

The only claim relied upon by the importer is for classification, with duty assessment at 40 per centum ad valorem, under paragraph 1023 of the act, reading:

PAR. 1023. All manufactures, wholly or in chief value of vegetable fiber, except cotton, not specially provided for, 40 per centum ad valorem.

It appears that the case was a representation before the trial court of the precise issue involved in a prior case instituted by the same importer and decided adversely to it by that court March 11, 1941 (see *W. X. Huber Co.* v. *United States*, 6 Cust. Ct. 141, C. D. 448). No appeal was taken in that case. Upon motion of counsel for the importer, counsel for the Government agreeing thereto, the record in that case (which included the samples) was made a part of the record in this case and the appellant introduced the testimony of an additional witness.

One witness (Albert T. Quon) testified on behalf of the importer in the first case and we here quote the trial court's summarization of his testimony as follows:

One witness testified for the plaintiff that he was familiar with this type of merchandise by reason of the fact that it is produced in great quantities in South China, his original home; that during his childhood he had seen it made in Canton

in the summertime, after harvest, by the servants of his household. As to the process of manufacture the witness testified that the material grows somewhat like the bamboo, to a height of from 4 to 6 feet and about ½ inch in diameter; the stalks are cut and allowed to lie on the ground and rot; they are then dried and sold in the market; that their surface is not quite as hard as bamboo. After the stalks are purchased in the market they are soaked in water, then pounded with a stone until broken or frayed; the fiber is then spread out, or picked or pulled off from the stalk by hand, piece by piece, and the fibers are thus separated from the original stalk. The fibers, which are relatively long, are then joined at the ends by overlapping two fibers about 4 inches and then rolling on the knee, using a small piece of pottery; the material being moist, the rolling of the two overlapping ends causes the two fibers to merge together into one continuous strand; that these fibers are not twisted together as in making cotton thread, but the ends are joined merely by overlapping them and rolling them together. The imported merchandise is then woven on a hand loom from the fiber or material above described.

In giving the above testimony the witness was testifying as to his observations when he was a small boy, from 1908 to 1916, and, so far as this record shows, the witness had not observed the method of manufacturing the instant merchandise since the year 1916.

The witness (Tong Siu) called by the importer in the instant case covered the period from 1916 to 1940, his testimony relative to the methods of production during that period being, in all material respects, the same as that of the witness Quon relative to the period from 1908 to 1916.

In view of the statement in the court's summarization reading that the "fibers are not twisted together as in making cotton thread, but the ends are joined merely by overlapping them and rolling them together," and because of certain phases of appellant's argument before us, we think it proper to quote verbatim certain of the testimony of the different witnesses.

From the cross-examination of Quon we take the following:

X Q. Have you ever seen thread made, the ordinary thread that we use here? You are familiar with the thread that we use?—A. Common thread, yes.

X Q. Yes. Have you ever seen thread made?—A. Yes, I have.

X Q. And is that made by the fibers of the cotton being twisted together?—A. Well, no. The cotton fiber is relatively short, while the fiber of this grass material is relatively long, as long as the cloth itself.

X Q. And in making cotton thread do they twist the fibers together to make a long strand out of it?—A. Yes, yes, but in the grass cloth you merely join the ends of the fiber by——

X Q. Join them?—A. Join the ends of the fiber by twisting the two fibers together.

X Q. And then when you get through you have got a strand.—A. You have a continuous length of thread.

X Q. Well, now, these fibers that they put together are not, that is not the grass in its natural state, is it?—A. No, it goes through the process of decomposition, drying and soaking.

X Q. And they have separated the filaments of the grass?—A. You mean separate the fibers?

X Q. Yes, separated the fibers.—A. Yes, it is a fibrous material.

The following is from his redirect examination:

R. Q. Mr. Quon, when you said that the stalks are twisted together—A. Yes, I mean the fibers twisted together.

R. Q. The fibers, do you say the fibers are twisted together?—A. Yes.

R. Q. Or do you mean that they were rolled together?—A. Well, rather, really rolled together is perhaps more correct.

R. Q. They are not tied?—A. No, not tied together. In China we have a little pottery piece, shaped more like the tile of your roof, and then put grooves on it. The woman will put it right on her thigh, like that, put the two ends together, and roll it on the knee.

Judge CLINE: On the knee, not the thigh.

The WITNESS: Because the material is moist; and by that particular action it causes the two fibers to twist together, to merge together to one continuous strand.

By Mr. STEIN:

R. Q. I see. But do they just do that with the ends or is it more than the ends that they merge together?—A. Well, they perhaps overlap about 4 inches, the two ends overlapping each other by 4 inches.

R. Q. By 4 inches?—A. Yes.

The following is from the direct examination of the witness Siu:

Q. How wide are those blades of grass?—A. About one inch or a little more.

Q. What have you seen done to those blades of grass?—A. They bought the grass at the market and took it home and soaked it in water, and then lay it on the ground, and pound it with rocks or heavy sticks.

Q. What do they do that for?—A. To make them soft. They make the fibers soft and then they twist them together and roll them up. They roll with their thigh.

Q. Roll them by hand?—A. Yes.

Q. What does that do to them?—A. Well, they roll them up, and then they put the fibers on a Chinese loom, they work with their hand to make the cloth.

Q. Let us get this straight: What do they do with the pieces which are twisted?—A. They roll them up in a little ball, and put them on the loom to make the cloth.

Q. How do they make the article out of these exhibits?—A. They make the cloth first and then out of the cloth they make whatever they want, like a dress for clothes, anything they want they cut out.

The following from his cross-examination:

X Q. How long are these fibers before you roll them together?—A. The length is maybe 5 feet or 4 feet or 3 feet. Sometimes it is a little longer, and sometimes shorter.

X Q. They roll them together?—A. First they twist these under, and then they roll them to make them tight.

X Q. They put them up in the form of balls, and that is when they are ready for weaving, is that right?—A. Yes.

In the incorporated case the Government introduced the testimony of the "Chief Chemist of the United States Customs at the Port of Los Angeles"—John W. Custer. The material part of his evidence on direct examination was as follows:

Q. Now I ask you if you made an analysis today or yesterday of a sample of cloth such as contained in Collective Exhibit 1?—A. I did.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Q. Now, Mr. Custer, how did you proceed and what were your findings?

\* \* \* \* \* \* \*

A. 1 examined the individual threads with a microscope.

\* \* \* \* \* \* \*

Q. And is that what you did?— A. Yes.

Q. And what did you find?— A. Each individual thread is made up of a variety of, a numerous number of individual filaments.

Q. And can you describe the filaments a little more definitely for us as to their source?— A. The filaments are ramie.

Mr. WEEKS: That is all.

On cross-examination he was asked and answered a number of questions about "fibers connected with the plant of the nettle family," but this part of his testimony has no relevancy to the issue before us here.

It will be observed that all the witnesses described the "strands" as "threads," and that the witnesses for the importer described them, in effect, as being twisted by the rolling process.

Briefly summarized, appellant's contention before us is to the effect that the "strands," composing the woven cloth from which the involved articles were cut, are not "yarns," not "threads," not "filaments," but are "fibers" and that the term "fibers" does not appear in paragraph 1529 (a), in consequence of which, it is insisted, the articles are not covered by the paragraph.

In support of its contention appellant, in its original brief (there was no oral argument on its behalf before us), quoted dictionary definitions of the several terms, and cited decisions of this court in a number of cases.

In the opinion (copies of which were forwarded to counsel as above set forth), stating the reasons for the conclusion at which we arrived, we did not quote dictionary definitions nor did we discuss the cases cited, and appellant's petition for rehearing complains of our failure to do so.

In the petition for rehearing it is asserted *inter alia* (references to pages of the record being omitted as indicated by stars):

The uncontradicted testimony adduced by appellant below established that the material of which the articles at bar are composed was submitted *only* to a *crude and simple processing,* and *never was advanced to the point of becoming a yarn, thread, or filament;* that when introduced or woven into the cloth of which the articles herein are composed, the material *was still in its condition as a crudely processed fiber* \* \* \*; that the processing of the fiber herein *differed* from the processing of a yarn, thread or filament \* \* \* in that *yarns and threads are spun,* while the material at bar was *not;* that filaments are *separated* fibers, while the fibers herein *were never separated into their individual filaments.* These are all undisputed facts of record, confirmed by the testimony of the Government chemist, who stated, "Each individual thread is made up of a variety of, a numerous number of individual filaments" \* \* \*; in other words, the material is admittedly, as appellant contends, *fibers not separated into their individual filaments.*

\* \* \* \* \* \* \*

This Honorable Court has clearly distinguished between "fibers" on the one hand, and the more advanced material into which fibers may be processed, viz., "yarns, threads and filaments". (*United States* v. *Marshall Field & Co.*, 18 C. C. P. A. 228, T. D. 44404; *United States* v. *Borgfeldt & Co.*, 14 Ct. Cust. Appls. 240, T. D. 41873. Appellant's brief pp. 10–12.) This court held in the *Marshall Field* case, *supra* (at p. 231, quoted in appellant's brief p. 11) *that "fibers" are "a stage back of" yarns, threads, or filaments, in the process of manufacture.* In these two cases, which arose under the Tariff Act of 1922, this Honorable Court held *merchandise composed of fibers,* to be *excluded* from paragraph 1430, the predecessor of paragraph 1529 of the Tariff Act of 1930, here involved.

The cases so cited arose under the Tariff Act of 1922, paragraph 1430 thereof (predecessor of paragraph 1529 of the 1930 act) being involved, and it is the contention of appellant that since Congress failed to insert the term "fibers" in paragraph 1529, the judicial interpretation stated in the cited cases received legislative ratification.

This may be conceded, but it is quite important that our decisions in those cases be correctly understood and fairly interpreted.

The merchandise involved in the *Borgfeldt & Co.* case, *supra*, consisted of rugs "made and in chief value of a foundation material of felted goat wool, pounded and pressed together, without further manufacturing process."

We stated the issue there involved as follows:

In its final analysis, there is but one question presented here, namely: Are the articles here composed wholly or in chief value of filaments? If they are, they should be classified under said paragraph 1430; if not, the judgment of the court below should be affirmed. No contention is made by the Government that the articles are composed wholly or in chief value of yarns or threads or of any of the various other materials named in said paragraph, except filaments.

Citing different authorities, we there sustained the decision of the trial court to the effect that the felted goat wool used in the manner described was not filaments within the meaning of the paragraph 1430. We had no occasion there to consider the term "fibers."

In the *Marshall Field & Co.* case, *supra*, the merchandise consisted of felt rugs composed wholly or in chief value of wool. While the testimony was not altogether clear, it was virtually conceded that the articles were not produced by weaving, but by felting in substantially the same manner as the rugs involved in the *Borgfeldt & Co.* case, *supra*, were produced. The woolen material which entered into their composition although capable of being made into yarns, threads, and filaments had not been processed to such forms.

We there said, *inter alia:*

We do not construe paragraph 1430 to mean that the mere fact that an article is composed of materials which are *susceptible of being made into yarns*, threads or filaments, but have not, in fact, been advanced to such a stage when put into the article, renders that article subject to the paragraph. The article, to come within the paragraph, must, we think, be composed wholly or in chief value of materials which, in the process of its making, were actual yarns, threads or filaments.

Under that construction (after finding that the material had not been processed to the stage of yarns, threads, or filaments), we held that the articles did not fall within paragraph 1430. In that case, as in the *Borgfeldt & Co.* case, *supra,* we had no occasion to pass upon the meaning or application of the term "fibers."

In the instant case we have accepted the statement that the strands composing the cloth from which the articles were fashioned were made of grass fibers. All the evidence supports it. Also, it may be conceded that "fiber" and "filament" are not synonymous terms. It does not follow from this, however, that the fiber strands composing the woven articles before us should not be held to be threads within the meaning of the term "threads" as that term is used in paragraph 1529.

One of the definitions of thread given in the 1932 edition of Webster's New International Dictionary is:

1. A very small twist of flax, wool, cotton, silk, or other fibrous substance, drawn out to some length; a compound cord of two or more single yarns doubled, or joined together, and twisted; often specif., cotton thread or, in some places, linen.

Among the definitions of fiber is the following:

2. A thread or threadlike structure or object; * * *
* * * * * * *
4. Collectively, any tough substance composed of threadlike tissue, whether of animal, vegetable, or mineral origin, and capable of being spun and woven; as, wool or silk *fiber;* hemp or flax *fiber;* asbestos or glass *fiber.* Vegetable fiber is of great commercial importance, and is yielded by the bast of many different plants.

The strands which compose the articles before us, while not processed on a machine (unless the grooved piece of pottery be regarded as a machine) were processed, in the manner described by the witnesses, to the form of threads or threadlike structures, ready for weaving, and, in fact, they were woven so that they constitute the whole of the cloth.

Having the foregoing in mind we stated in our original opinion (without quoting definitions because it was deemed unnecessary) the following:

It seems to us that when the precise nature of the strands which were so woven as to compose the cloth articles here involved is considered from any reasonable, common sense point of view, it must be obvious that they were thread-like *filaments* of fibrous material so processed or advanced as to be fitted for weaving. The finished articles themselves demonstrate this, because they are composed wholly of strands brought together in cloth form by a weaving process carried out on a loom. [Italics new here.]

We concede that the word "filaments" above italicized was not the proper term, and the same is withdrawn and the term "structures" substituted therefor.

The petition for rehearing indicates a belief on the part of counsel that in reaching our conclusion we relied chiefly upon our own examination and inspection of the samples in evidence. Such was not the case. The testimony was fully considered along with the samples. Of course, it was entirely proper for the court to inspect the samples. Appellant must have introduced them so that they might be inspected.

Appellant seems to attach much weight to the fact that the vegetable material entering into the composition of the articles was submitted only to a crude and simple processing, and contends that it was never advanced to the point of becoming a yarn, thread, or filament.

It may be conceded that the processing was by a crude method but we are unable to agree that a thread was not produced thereby. In fact, as the strands appear in the articles (and they were woven into it without other processing than that of the so-called crude method employed), they are smooth threads having reasonable uniformity in dimension and really make a very good looking (although doubtless a comparatively cheap) article.

We adhere to the conclusion originally reached, and the judgment of the United States Customs Court is *affirmed*.